(No. 32290.—

WILLIAM E. BODE *et al.*, Appellees, *vs.* EDWARD J. BARRETT, Secretary of State, *et al.*, Appellants.

*Opinion filed March 20, 1952—Rehearing denied May 23, 1952.*

IVAN A. ELLIOTT, Attorney General, of Springfield, (JOHN T. CHADWELL, FRANK M. PFEIFER, and WILLIAM C. WINES, of counsel,) for appellants.

HOFFMANN & HOFFMANN, and HUGH J. GRAHAM, JR., both of Springfield, and KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, of Chicago, for appellees.

EDWIN D. LAWLOR, and DUDLEY R. SULLIVAN, both of Chicago, *amici curiae*.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This is a direct appeal by the Secretary of State, the Auditor of Public Accounts and the Treasurer of the State of Illinois, defendants below, from a final decree of the circuit court of Sangamon County, which declared unconstitutional and void an act of the Sixty-seventh General Assembly, approved by the Governor of Illinois on July 9, 1951, entitled "An Act to amend Sections 9, 11a and 20 and to repeal Sections 9b, 9c, 9d, 9e, 9f, 9g, 9h, 9i, 9j, 9k and 9l of the 'Motor Vehicle Law,' approved June 30, 1919, as amended," (Laws of 1951, p. 1147,) and which enjoined and restrained the defendants from expending public funds in the administration and enforcement of the act and from doing any acts to enforce or administer the act.

In substance, section 9 of the Motor Vehicle Law as amended by the 1951 act (Ill. Rev. Stat. 1951, chap. 95½, par. 9) imposed on all owners of vehicles of the second division as defined in the act (trucks, busses, tractors, semi-trailers, trailers, etc.) for the use of the public highways a substantially increased flat annual license tax, graduated in amount by brackets, according to gross weight, including weight of the vehicle and maximum load. Subsections (h), (h-1), and (i) to (i-4) inclusive, of said section, classified

vehicles as to the number of wheels as well as gross weight. Subsection (j) provides that a self-propelled vehicle operated as a tractor and one semitrailer shall be considered as one vehicle in computing fees, but that a semitrailer used with any device for converting it to a trailer or attached to a leading trailer or a semitrailer shall be licensed as a trailer. Subsection (k) provides that each additional semitrailer to be used with a tractor, licensed as above, shall pay a license fee of $5.

Subsection (*l*) imposes a license tax on trailers graduated in brackets according to gross weight, including weight of trailer and maximum load, but different from other classifications in both weight brackets and tax. Thereafter, said subsection imposes a graduated license tax according to gross weight on "Two axle vehicles which are designed and used for transporting more than seven passengers entirely within the territorial limits of a single municipality or a single municipality and municipalities contiguous thereto, or a close radius thereof, are equipped with hydraulic shock absorbers and whose rates for transportation are subject to the regulation of the Illinois Commerce Commission," at a substantially lesser rate than is imposed on other four-wheel vehicles in the same general gross-weight bracket.

The last paragraph of said section 9 as amended exempts, from the operation of the act, farm tractors, traction engines, certain specifically described farm machinery, "or like vehicles, trailers or semi-trailers used in connection therewith, which are used primarily in the agricultural pursuits of the owner thereof or in connection with the agricultural pursuits of others, * * * but nothing in this proviso shall exclude from registration, truck tractors, trucks, trailers or semi-trailers engaged in transporting agricultural products."

The amendatory act of 1951 also repealed outright former sections 9b to 9*l*, inclusive, of the Motor Vehicle Law (Ill. Rev. Stat. 1949, chap. 95½, pars. 10a to 10k, incl.,)

which sections provided for an optional mileage weight license tax in lieu of a flat weight tax on vehicles of the second division at the election of the vehicle owners under certain conditions.

Sections 11a and 20 of the Motor Vehicle Law (Ill. Rev. Stat. 1951, chap. 95½, pars. 12a and 22,) were amended by striking therefrom all reference to the optional mileage weight taxes previously contained therein. Otherwise, they are identical with the previously existing sections.

Section 20 of the act (Ill. Rev. Stat. 1951, chap. 95½, par. 22,) specified the manner of application of the act to nonresident owners and, in order to effectuate the purpose of the section, authorizes the Secretary of State to enter into reciprocal agreements with responsible officers of other States as to license fees, permits, and flat taxes, under which nonresidents' second division vehicles may be operated in Illinois without an Illinois registration, provided like privileges are accorded to vehicles owned by Illinois citizens.

The plaintiffs brought this suit as citizens and taxpayers of the State of Illinois on behalf of themselves and all other taxpayers of the State pursuant to the statute authorizing suits in equity by taxpayers, in proper cases, to restrain the disbursement of public moneys by officers of the State. (Ill. Rev. Stat. 1951, chap. 102, pars. 11-16.) Each of the plaintiffs is a citizen, a taxpayer, the owner of a truck currently and properly registered, and the holder of a certificate of convenience and necessity as a local carrier under the provisions of the Illinois Truck Act. Ill. Rev. Stat. 1951, chap. 95½, pars. 240-282.

The complaint filed by the plaintiffs directly challenged the constitutionality of the amendatory act in question in numerous respects which may be summarized as follows:

I. By ignoring the difference in use of the highways by the various established classes of vehicles, viz: line-haul and other common carriers, local carriers, private carriers,

contract carriers and specialized carriers, said act imposes a burdensome graduated flat tax which,

a. Bears no fair relation to the privilege of using the highways and is in violation of sections 1 and 2 of article IX of the constitution.

b. Has no consistent theme of classification, contrary to sections 1 and 2 of article IX and to section 22 of article IV of the constitution.

c. Thereby is discriminatory as between classes of users and confiscatory as to some, in violation of section 2 of article II of the Illinois constitution, and the fourteenth amendment to the constitution of the United States.

II. The amendment violates article III and section 2 of article II of the constitution in the following respects:

a. It creates a favored class of two-axle busses operating in a municipality or municipalities or "close radius thereof" without defining said terms.

b. It bases the tax on "maximum load" while giving no standard for determining the same.

c. It creates confusing and indefinite classifications and omits vehicles authorized by law to use the road.

d. It authorizes the Secretary of State to enter into reciprocal agreements with responsible officers of other States, which is in violation of section 8 of article I of the constitution of the United States.

e. It creates an indefinite agricultural exclusion.

f. It creates a confusion as to trucks of school districts or imposes a heavy tax thereon, which is in violation of sections 3 and 10 of article IX of the Illinois constitution.

III. The heavy flat tax imposed discriminates against Illinois residents and nonresidents from nonreciprocal States in favor of nonresidents from reciprocal States, and imposes an undue burden on interstate commerce in violation of section 8 of article I of the constitution of the United States, and is arbitrary and discriminatory in violation of section 2 of article II of the Illinois constitution

and the fourteenth amendment to the constitution of the United States.

The trial court, after hearing the evidence, found the act unconstitutional on each of the counts alleged and entered an injunction order as previously stated.

Both parties attach importance to the historical development of the motor vehicle law in Illinois and a correct understanding thereof is pertinent to the decision in this case, particularly as concerns vehicles in the second division (all vehicles other than those designed for carrying not more than seven persons.)

The original Motor Vehicle Law was approved on June 30, 1919, and, as amended from time to time, remains in effect today. (Ill. Rev. Stat. 1951, chap. 95½, pars. 1 *et seq.*) Section 3 of the original act fixed maximum weights and dimensions of vehicles and was amended from time to time until finally repealed in 1935 upon adoption of the Uniform Act Regulating Traffic on Highways, (Ill. Rev. Stat. 1951, chap. 95½, pars. 98 *et seq.*,) which covered the same subject matter.

Section 9 of the act, since its adoption, has continuously imposed a flat annual license fee for the use of the highways upon second division vehicles, based upon gross weight of the vehicle and maximum load, graduated in amount according to weight brackets or classifications. Amendments from time to time added new weight brackets, revised existing weight brackets, and established separate classifications and brackets for special types of vehicles such as trailers, semitrailers, combinations and busses. Until the 1951 amendment in question, no significant or substantial increases had been made in license fees imposed by section 9. The section, as originally enacted, exempted tractors, traction engines, or other similar vehicles used exclusively in agricultural pursuits, from its application. This proviso excluding farm vehicles was amended in 1931 by adding a number of specifically described agri-

cultural machines and the following language: "or other similar vehicles or trailers, or semi-trailers used in connection therewith which are used primarily in the agricultural pursuits of the owner thereof or in connection with the agricultural pursuits of others, * * * but this exception in the proviso shall not exclude from registration trucks, trailers or semi-trailers engaged in transporting agricultural products." (Laws of 1931, p. 788.) This proviso exempting agricultural machines has remained substantially unchanged to the present time.

In 1921, section 9-A was added to the Motor Vehicle Law imposing an additional license fee on certain vehicles carrying freight or passengers for hire on the basis of a specified rate per mile travelled. (Laws of 1921, p. 577.) This section was amended in 1923 to impose an additional tax on such vehicles on the basis of a certain rate for each one-hundred pounds of gross weight of vehicle and load. (Laws of 1923, p. 552.) Such amendment also provided that the weight of freight vehicles should be computed by adding "manufacturers rated carrying capacity" to the weight of the vehicle fully equipped. This section continued substantially the same until repealed in 1935.

Upon repeal of section 9a in 1935, the act was amended to include an optional mileage weight tax, whereby a license tax was imposed measured by the number of miles actually travelled in the State by the vehicle, graduated in rate according to gross-weight brackets. (Ill. Rev. Stat. 1949, chap. 95½, pars. 10a to 10k, incl.) Operators were given an option to register their vehicles and to pay license fees under either the annual flat tax or the mileage weight tax. This amendment remained in force substantially in the same form until repealed by the 1951 amendment.

In 1945, the provisions of the Uniform Traffic Act regulating weight, load and length (Ill. Rev. Stat. 1945, chap. 95½, pars. 221-232, incl.) were amended so as to eliminate in general the word "wheel" from the act and to

establish maximum weight limits by vehicles classified as to number of axles and weights per axle. No such classification has ever been uniformly adopted in section 9 of the Motor Vehicle Law, but it has retained primary classifications of vehicles by wheels.

Section 20 of the act, as originally adopted in 1919, in general exempted nonresident passenger vehicles from the act, provided the owner had complied with any law requiring registration of his vehicle in the State of his residence, but only to the extent that the laws of the nonresident's State granted like exemptions and privileges to vehicles owned by residents of this State. In 1929, the act was amended so as to exempt nonresident vehicles of the second class as well as passenger vehicles on the same conditions. The act has continued in force to the present date in substantially the same form except that in 1945 the second paragraph providing for reciprocal agreements by the Secretary of State was added.

From the foregoing, it appears that the principal changes made by the 1951 amendment to the Motor Vehicle Law are:

A. A substantial increase as of January 1, 1952, in annual flat license fees for vehicles of the second division with provision for further increases as of January 1, 1954.

B. Repeal of the optional mileage weight tax.

C. Creation of a new classification of two-axle busses with shock absorbers subject to Illinois Commerce Commission regulation operating in municipalities or a close radius thereof, with no substantial license increase as to such classification.

The plaintiffs introduced in support of their contentions the testimony of several truck operators of various classes and a large volume of documentary evidence. As of May 1, 1951, there were in the State of Illinois 151 authorized line haul carriers, 20,523 authorized local carriers, 2,380 specialized carriers and 1,766 contract carriers, as those

types of carriers are defined in the Illinois Truck Act. (Ill. Rev. Stat. 1951, chap. 95½, pars. 240 *et seq.*) To establish the large annual mileage travelled by line-haul carriers, the plaintiffs introduced testimony and reports of one carrier of such classification, the Peoria Cartage Company, showing an annual average mileage for 46 tractor units of 68,097 miles. To establish the large annual mileage of city busses the records of Illinois Transit Company, Danville City Lines, Springfield Transportation Co., Champaign-Urbana Lines, Inc., and Decatur City Lines, Inc., were introduced showing an average annual mileage per bus of 43,628 miles and records of Chicago Motor Coach Company were introduced showing an average of 49,500 miles per bus. To establish the low annual mileage of private and local carriers, the plaintiffs first introduced records of about ten operators in each of five different weight brackets who had been operating under the mileage weight option, showing an average annual mileage per private carrier of 3982 miles. The mileage records of several other truckers operating under the mileage weight option were also introduced, including those of 25 Chicago coal companies operating 108 trucks, showing an annual average of 4232 miles per truck, and eight interstate truckers' records were introduced. The testimony of three farmers who operated trucks showed variations of from 3500 to 10,000 miles per year per truck. A tabulation as to the effect of the new rates on the various truckers mentioned in plaintiffs' evidence by classification shows an increase from 243 per cent to 1363 per cent for private carriers, from 309 per cent to 1404 per cent for Chicago coal operators, from 238 per cent to 344 per cent for local carriers serving farmers, 739 per cent for a local business carrier, 315 per cent and 363 per cent for two local transfer companies, and 370 per cent for a specialized carrier. It is to be noted that most of the operators cited used the optional mileage weight tax. One witness for the plaintiffs testified that

he intended to sell his truck, and another testified that he was thinking of doing so. The testimony of four witnesses for the plaintiffs showed that the increase in tax will exceed their past net profits and probably force them out of business. Two other of plaintiffs' witnesses testified that they could not pass the increase on to customers because of ceiling prices or competition from other types of carriers. Other evidence was introduced by the plaintiffs showing that there are in existence and use some four-wheel vehicles exceeding in gross weight 30,000 pounds, showing that in the motor industry the number of wheels per axle of the vehicle is variable, and showing various facts concerning capacity of trucks, weight distribution on axles and weight distribution in combined vehicles, and various other facts pertinent to the motor industry.

Defendants' evidence, although relatively brief, bears primarily on the underlying theory of the increased license taxes imposed by the amendatory act in question. The tabulated results of a detailed engineering survey of the estimated needs, both in mileage and cost, to meet present and future deficiencies of the State primary highway system during the period of 1951 to 1960, were introduced, from which it is indicated that during said ten-year period there would be a need for 7466.20 miles of highway construction at a total estimated cost of $1,151,041,232 to the State.

An estimate of the funds available for State primary highway constructions during said ten-year period, based on the 1950 level of motor vehicle registration and the 1950 motor fuel tax, was next introduced. Estimated receipts were based on the license fees imposed by the 1951 amendment, as well as receipts from all other sources, including a five-cent motor fuel tax and operators' licenses. Such report showed a sum of $676,961,887 available from those sources during the ten-year period for construction of highways. A State engineer testified that the

increase in the 1951 vehicle registrations and fuel consumption over the base year of 1950 just about offset the estimated increase in construction cost for the same period. Thereafter the calculations made by the State Department of Public Works and Buildings to equalize passenger car taxes on a ton-mile basis through truck license fees and a five-cent motor fuel tax was introduced. The calculations start with the 1949 motor vehicle registration broken down as to both type and weight class of vehicle and as to flat fee or mileage weight trucks. Such tabulation shows 1949 registrations of 2,078,704 passenger vehicles, 324,109 flat license trucks and 11,935 mileage weight trucks. The 1950 registrations showed 2,286,572 passenger vehicles, 347,032 trucks and 58,415 trailers. The average travel per year of each type of vehicle is next shown in the calculations. These figures were taken from a comprehensive report made in 1948 covering the Illinois highway problem by an independent engineering concern employed by the State of Illinois for that purpose.

From evidence introduced at the trial, such average travel-per-year figures were based on the results of a questionnaire survey of motor vehicle owners and operators made in the late thirties in Illinois and other States, as were other figures used, such as fuel consumption, modified as justified by later information.

After computing the vehicle miles per class per year, the calculations computed the total gallons of motor fuel used per class per year, based on average miles per gallon of fuel per class, and thereby determined the motor fuel tax revenue at the five-cent rate by class of vehicle. Applying the average gross weight in tons by class, as determined from the independent engineer report and sample weighings of trucks in Illinois over a three-year period, to the vehicle miles per class per year, the ton miles per class of vehicle was determined. The ton-miles per class were then divided into both motor fuel tax revenue and license fee revenue

by class to determine the total fees per ton-mile paid by various classes of vehicles for the privilege of using the highways. It was thereby found that passenger vehicles paid a fee of $0.00251 per ton-mile and that, except for trucks under 3000 pounds, trucks paid a substantially less amount per ton-mile.

Thereupon, calculations were made to determine the average change in revenue per truck by class which was necessary to equal the ton-mile fees paid by passenger vehicles. Flat license fees per weight bracket as adopted by the 1951 amendment apply and adopt the license fees as thus equalized, rounded out to the nearest dollar. The records of sample weighings of two-axle trucks by the State in the years 1946, 1948 and 1949, show a total of 12,311 such trucks, their weight and distribution in the various weight brackets. Of this number, one such truck, only, exceeded 30,000 pounds in weight and was illegally overloaded on the rear axle. A State official from the office of the Secretary of State, charged with administering the motor vehicle law, testified that for more than the past seventeen years it has been the practice in that Department to consider motor vehicles as having two wheels per axle and one axle per each two wheels. He also testified that the combination of "weight of vehicle" and "weight of maximum load" for license purposes was determined solely from the sworn affidavit of the application for license, which system had been in force in his Department for more than seventeen years and had caused no confusion in the office in the administration of the act.

The act imposes a tax on motor vehicles for the use of public highways by its explicit terms, which tax, pursuant to the Motor Vehicle Act, must be deposited in a special road fund to be used only for retirement of bonded indebtedness for construction of highways, payment of the cost of administration of said act, and for improvement and maintenance of the highways of the State. The tax

under consideration here is not unlike the motor fuel tax or wheel tax ordinances which impose taxes for the privilige of using vehicles on the streets and highways. This court has held in *People* v. *Deep Rock Oil Corp.* 343 Ill. 388, and *City of Lincoln* v. *Gerard,* 329 Ill. 501, that such a tax is an excise or privilege tax and not a property tax. The owner of such vehicle may be required to pay an *ad valorem* tax thereon and may likewise be required to pay a tax upon the right or privilege of the use of the highways, which is an entirely different matter.

The use taxed by the 1951 act is a use which exploits the public highways of the State. We do not now decide whether "use taxes" in general, of the sort countenanced by the constitutions of many other States, are or are not valid under our own constitution of 1870. What we do hold is that a tax for the privilege of the use of the highways is not invalid as a property tax upon the vehicles that use the thoroughfares of the State.

Taxation upon values, an occupation tax or license, and a tax on the privilege of using vehicles on the public streets are different subjects and do not constitute double or triple taxation because paid by one person. (*City of Lincoln* v. *Gerard,* 329 Ill. 501; *Roe* v. *City of Jacksonville,* 319 Ill. 215.) That a State has power to select that use, as distinguished from others, upon which to impose an excise tax has been definitely settled by the decisions of this court and courts of other jurisdictions, and in cases of this nature they have clearly been held to be an excise or privilege tax. (*People* v. *Deep Rock Oil Corp.,* 343 Ill. 388; *City of Lincoln* v. *Gerard,* 329 Ill. 501; *Kane* v. *State* (1911), 81 N.J.L. 594, L.R.A. 1917B 553, affirmed in *Kane* v. *New Jersey,* 242 U.S. 160, 61 L. ed. 222, 37 S. Ct. 30; *Interstate Busses Corp.* v. *Blodgett* (1928), 276 U.S. 245, 72 L. ed. 551, 48 S. Ct. 230; *Peterson* v. *Department of Public Works* (1931), 120 Neb. 517, 234 N.W. 95; *Camas Stage Co.* v. *Kozer* (1922), 104 Ore.

600, 25 A.L.R. 27, 209 Pac. 95; *State* v. *Caplan* (1927), 100 Vt. 140, 135 Atl. 705; *Johnson Transfer and Freight Lines* v. *Perry* (1931) (Ga.), 47 Fed. 2d 900; *Rocky Mountain Lines* v. *Cochran* (1941), 140 Neb. 378, 299 N.W. 596.

In the case of *People* v. *Deep Rock Oil Corp.* 343 Ill. 388, it is to be noted that this court, in passing upon the validity of the Motor Fuel Tax Act there in question, observed that at the same session of the legislature which passed the Motor Fuel Tax Act, sections 8 and 9 of the Motor Vehicle Law were amended, and that the fees collected from both acts were deposited and set apart as a special fund known as the road fund to be used for the purposes specified in section 36 of the Motor Vehicle Law. This court then said: "All of said acts, having been passed at the same session of the legislature, the rule of construction applicable thereto is that each should receive a construction, if possible, which will give effect to all * * * of the acts. [Citations.] When these acts are read together, they provide a complete scheme for financing state road construction in this State. These taxes, while both excises, are similar neither in character nor amount. One is based on the character and horsepower of the vehicle, and the other is limited to the use of the highways as measured by the amount of gasoline consumed in such use."

We must observe that, at the same session of the legislature in which the amendatory act here in question was passed, the Motor Fuel Tax Act was amended providing for an increase in motor fuel taxes to four cents per gallon from August 1, 1951, to December 31, 1952, and thereafter at five cents per gallon.

There is no constitutional inhibition against more than one privilege or excise tax where the total does not exceed reasonable taxation for the privilege enjoyed. It is incumbent on the plaintiffs to show that the aggregate charge

bears no reasonable relation to the privilege granted. *People* v. *Deep Rock Oil Corp.* 343 Ill. 388.

The fact that public highways and their use are public property has been so thoroughly established that the general proposition has been affirmed that no person has the right to conduct a business upon them or to devote them to private gain except as the State, by acquiescence or by law, may permit him. Clearly "Their use for purposes of gain is special and extraordinary, which, generally at least, the legislature may prohibit or condition as it sees fit." *Stevenson* v. *Vinford* (1932), 287 U.S. 251, 77 L. ed 288, 53 S. Ct. 181, 87 A.L.R. 721.

The leading case on the right of a State to tax motor vehicles and interstate commerce is *Hendrick* v. *Maryland* (1915), 235 U.S. 610, 59 L. ed. 385, 35 S. Ct. 140. It held that a State may require persons operating motor vehicles in a State to obtain a license or registration certificate from a State authority and to pay a fee therefor. The charging of fees was held to be justified as a contribution to the expense of departmental supervision and police oversight and as compensation for the use of the State's highways. The court said: "The movement of motor vehicles over the highways is attended by constant and serious dangers to the public and is also abnormally destructive to the highways themselves. Their success depends upon good roads, the construction and maintenance of which are exceedingly expensive; and in recent years insistent demands have been made upon the states for better facilities, especially by the ever increasing number of those who own such vehicles." After observing that, in the absence of national legislation covering the subject, a State may prescribe uniform regulations for motor vehicles under its police power and that the reasonableness of the State's action is always subject to inquiry so far as it affects interstate commerce, the court declared further:

"In view of the many decisions of this court, there can be no serious doubt that where a state at its own expense furnishes special facilities for the use of those engaged in commerce, interstate as well as domestic, it may exact compensation therefor. The amount of the charges and the method of collection are primarily for determination by the state itself; and so long as they are reasonable and are fixed according to some uniform fair and practical standard, they constitute no burden on Interstate commerce * * *. The action of the state must be treated as correct unless the contrary is made to appear."

The above decision was followed in a second leading case, *Kane* v. *New Jersey* (1916), 242 U.S. 160, 61 L. ed. 222, 37 S. Ct. 30, which enlarged its application. In that case the statute provided that all moneys received from license and registration fees in excess of the amount required for the maintenance of the motor vehicle department should be applied to the maintenance of improved highways. It appeared that the aggregate of these fees for the current year had yielded a large sum for maintenance of the improved roads of the State. The court sustained the statute, among other things noting that the principle of *Hendrick* v. *Maryland* applied to the amount of fees charged although they were shown to result in a surplus over the expenses of maintaining the regulation and inspection department, the surplus being applied to the maintenance of improved roads.

The doctrine of *Hendrick* v. *Maryland* was extended to common carriers by motor vehicles in *Clark* v. *Poor* (1927), 274 U.S. 554, 71 L. ed. 1199, 47 S. Ct. 702. There, the court held that common carriers for hire who make the highways their place of business may properly be charged an extra tax for such use.

Thereafter, in *Interstate Busses Corp.* v. *Blodgett* (1928), 276 U.S. 245, 72 L. ed. 551, 48 S. Ct. 230, the court established, as to interstate carriers, that: first, the

tax need not be of the nature of a license or registration fee but may be an outright tax directly charged upon the carrier in respect of its actual highway operations if it is devoted to highway purposes; second, the tax may be different in form and basis from that levied upon similar intrastate carriers; third, that the interstate carrier is entitled to relief against the special tax levied upon him as such if it proves as a fact that the tax imposes a substantially greater burden upon it than upon those engaged in the corresponding intrastate business; or, fourth, proves as a fact that the aggregate charge bears no reasonable relation to the privilege granted.

In *Interstate Transit* v. *Lindsey* (1931), 283 U.S. 183, 75 L. ed. 953, 51 S. Ct. 380, Tennessee levied a privilege tax on interstate busses alone in which a tax graduated according to carrying capacity was imposed and the amount was $500 per year for all busses seating from twenty to thirty passengers. The court declared the act invalid, holding that as the tax was a direct burden on interstate commerce, it could not be sustained except upon an affirmative showing that it was levied only as compensation for use of the highways or to defray the expense of regulating motor traffic. This the court said might usually be indicated either by the nature of the imposition such as that of a mileage tax, or by an express allocation of the proceeds to highway purposes.

In *Hicklin* v. *Coney* (1933), 290 U.S. 169, 78 L. ed 247, 54 S. Ct. 142, a license fee laid upon private contract carriers according to the size and weights of the trucks was sustained, the court presuming that it was charged as compensation for the use of the roads. In its decision the court distinguished the *Lindsey case* from one in which the statute distinctly allocated the proceeds of the tax to highway purposes.

The result in general legislation and State court decisions thereafter seems to be an assumption that a test of

the validity of such taxes was their specific appropriation to highway purposes.

However, in *Morf* v. *Bingaman* (1936), 298 U.S. 407, 80 L. ed. 1245, 56 S. Ct. 756, the court held that at least in the case of a fee charged for the privilege of using the State's highways:

"It is immaterial whether the state places the fees collected in the pocket out of which it pays highway maintenance charges, or in some other."

Also, in *Dixie-Ohio Express Co.* v. *State Revenue Commission* (1939), 306 U.S. 72, 83 L. ed. 495, 59 S. Ct. 435, the court again held that if the tax is a reasonable compensation for the privilege of using the highways, it is not essential to its validity that the State use the proceeds of it for other purposes than the construction, improvement or maintenance of its highways. In that case the appellant had contended that the tax by weight upon its vehicle was not a fair compensation for its use of the highways because the proceeds were allocated to the upkeep of rural highways, none of which the appellant used. The court's pronouncement went further, however, than the mere rejection of this argument. The decision seemed to settle two points, specifically: first, that it is not essential to the validity of the tax as touching interstate commerce that its proceeds be actually appropriated to highway purposes, and, second, that it is not essential to that validity, as concerned the appellant, that its use of the highways is not enough to warrant the tax, if the privilege of using them is of sufficient value to warrant it.

In *Aero Mayflower Transit Co.* v. *Georgia Public Service Com.* (1935), 295 U.S. 285, 79 L. ed. 1439, 55 S. Ct. 709, the proposition laid down in the *Lindsey case* that the measure of the tax should somehow relate to the carriers' use of the highways was drawn into question when the court held that the State could require payment of a moderate license fee in the same amount from all motor

carriers regardless of the extent to which each used the highways.

In *Aero Mayflower Transit Co.* v. *Railroad Comrs.* (1947), 332 U.S. 495, 92 L. ed. 99, 68 S. Ct. 167, the court held valid a Montana statute which imposed a flat license fee and a tax on gross operating revenue in consideration of the use of the highways of the State, none of which fees were segregated but all of which were paid into the State's general fund. The opinion declared it too late to question that a State may levy upon motor vehicles a reasonable nondiscriminatory tax as compensation for the use of its highways and that it was immaterial whether the proceeds are allocated to highway uses or others.

The most recent case involving this problem appears in *Capitol Greyhound Lines* v. *Brice* (1950), 339 U.S. 542, 94 L. ed 1053, 70 S. Ct. 806, 17 A.L.R. 2d 407. In this case the court sustained an *ad valorem* tax imposed by the State of Maryland on vehicles as a condition to their original registration or reregistration. The effect of this case is to hold that a tax of this nature should be judged by its result, not its formula, and must stand unless the amount is shown to be in excess of fair compensation for the privilege of using State roads.

From the foregoing, it is concluded that the State has the power and right to impose an excise tax on motor vehicles for the privilege of using State roads, the constitutionality of which is not to be measured by the formula imposing the tax. The proper test of constitutionality is whether or not the total of excise taxes levied for the privilege of using State roads produces an amount which is shown to be in excess of fair or reasonable compensation to the State for such privilege.

Since the formula used in imposing the tax is not a measure of constitutionality so long as it may be deemed a reasonable exercise of legislative judgment, it is not required that motor vehicle license laws necessarily be

framed on the basis of mileage taxes, and numerous cases have so held. (*Carley and Hamilton, Inc.* v. *Snook,* 281 U.S. 66, 74 L. ed. 704, 50 S. Ct. 204; *Aero Mayflower Transit Co.* v. *Georgia Public Service Com.* 295 U.S. 285; *Dixie-Ohio Express Co.* v. *State Revenue Com.* 306 U.S. 72; *Hicklin* v. *Coney,* 290 U.S. 169.) So long as the tax imposed returns not in excess of a fair and reasonable compensation for the privilege of using the State roads, the tax may be imposed as a flat license fee, as an inspection fee, or may be a tax measured by weight or load capacity, by mileage, by weight and mileage, by passenger capacity, by passenger capacity and weight, by passenger capacity and mileage, by value of vehicle, or by fuel purchased or consumed. See cases cited in annotation appearing in 17 A.L.R. 2d 421.

It is true that the State, in the discretion of its legislature, may tax carriers for hire at rates exceeding those imposed upon private carriers. (*Dixie-Ohio Express Co.* v. *State Revenue Com.* 306 U.S. 72.) However, there is no constitutional requirement that a difference in rate be made between private carriers and carriers for hire. (*Eavey Co.* v. *Dept. of Treasury of Indiana,* 216 Ind. 255, 24 N.E. 2d 268 (1939), appeal dismissed for want of substantial Federal question in 310 U.S. 611, 84 L. ed 611, 60 S. Ct. 1081.) In the last case cited, an act of the Indiana legislature had removed an exemption of shipper-owners' trucks from the Indiana motor vehicle weight tax so that they were taxed on the same basis according to weight as were trucks and carriers for hire. The court there held that the taxation of trucks of shipper-owners and those of carriers for hire upon the same basis was entirely reasonable and not subject to constitutional objection, saying: "It is well known that under the law existing before the enactment of chapter 255, certain shipper-owners were not taxed. The legislature evidently concluded that the untaxed shipper-owner possessed an advantage over contract carriers and

those who kept trucks for hire and concluded that one caused as much wear and tear on the highways as the others and that the shipper-owner in all fairness should be subject to a tax in order to pay his proportionate part of the construction and upkeep of the highways. Instead of subdividing the class and exempting certain owners of trucks as was done by the 1933 tax, both trucks used by owners in transporting their own products and trucks used for hire are placed in the same class and made subject to the same weight tax by chapter 255."

So long as the total amount produced by the tax is not in excess of fair or reasonable compensation for the privilege of using the roads, mathematical accuracy in whatever formula is used is not required but "rough approximation rather than precision" suffices. (*Capitol Greyhound Lines* v. *Brice,* 339 U.S. 542.) As this court said in *Schreiber* v. *County of Cook,* 388 Ill. 297: "Perfect equality and uniformity of taxation as regards individuals or corporations or different classes of property subject to taxation can hardly be visualized. Absolute equality is impracticable in taxation and is not required by the equal protection clause of the constitution. Inequalities that result occasionally and incidentally in the application of a system that is not arbitrary in its classification, and not applied in a hostile and discriminatory manner, are not sufficient to defeat the tax. [Citations.] Mere inequities in the administration of the law violate no constitutional rights."

The fact that a tax, as applied to an individual, may put such individual out of business is not considered a valid argument against the tax, if the tax is otherwise reasonable in the relation to the cost of the highways or the abstract value of the privilege of using them. *Grolbert* v. *Railroad Comrs.* (1932, Ia.), 60 Fed. 2d 321; *State* v. *Overstate Transportation Co.* (1931), 101 Fla. 1143, 132 So. 825; *Magnano Co.* v. *Hamilton,* 292 U.S. 40, 78 L. ed. 1109, 54 S. Ct. 599.

"One who receives a privilege without limit," said the Supreme Court of the United States in *Aero-Mayflower Transit Co.* v. *Georgia Public Service Com.* 295 U.S. 285, "is not wronged by his own refusal to enjoy it as freely as he may." In that case the Supreme Court of the United States sustained a statute of the State of Georgia licensing the use of trucks on the public highway.

Indeed, even when the tax is imposed upon a nonresident and wholly with respect to interstate commerce, a State may tax the full measure of the privilege granted regardless of how little the privilege is exploited. In *Hicklin* v. *Coney,* 290 U.S. 169, the Supreme Court of the United States sustained a State automobile license tax upon a nonresident who was compelled to pay a tax of $400 for a single trip into the State with a single vehicle. The privilege granted entitled the licensee to make unlimited use of the State's highways. That the licensee, for reasons of his own, availed himself of the privilege only once in the year raised no constitutional objection to the tax. See, also, *Capitol Greyhound* v. *Brice,* 339 U.S. 542, upholding a State act that licensed and taxed busses by an *ad valorem* exaction in addition to general property taxes. Objection was made that, at least with respect to nonresident owners, this tax bore no reasonable relation to the value of the use of the highways licensed under the act.

If a State may thus tax nonresident owners with respect to interstate commerce, measuring the tax by the value of the privilege granted and disregarding the extent to which the privilege is availed of, *a fortiori* it may tax its own citizens for the privilege of using State highways without regard to how much or how little the licensees actually take advantage of the privilege conferred upon them.

In the *Mangano case* the United States Supreme Court, in sustaining the validity of a State statute imposing a large excise tax on butter substitute sold within the State said: "The point may be conceded that the tax is so excessive

that it may or will result in destroying the intrastate business of appellant; but that is precisely the point which was made in the attack upon the validity of the 10% tax imposed upon the notes of state banks involved in *Veazie Bank* v. *Fenno,* 8 Wall 533, 19 L. ed. 482. This court there disposed of it by saying that the courts are without authority to prescribe the limitations upon the exercise of the acknowledged powers of the legislative departments. 'The power to tax may be exercised oppressively upon persons but the responsibility of the legislature is not to the courts but to the people by whom its members are elected.' Again, in the *McCray case,* 195 U.S. 27, 49 L. ed. 78, 24 S. Ct. 769, answering a like contention, this court said that the argument rested upon the proposition 'that although the tax be within the power, as enforcing it will destroy or restrict the manufacture of artificially colored oleomargarine, therefore, the power to levy the tax did not obtain. This however, is but to say that the question of power depends, not upon the authority conferred by the Constitution, but upon what may be the consequence arising from the exercise of the lawful authority.' And it was held that if a tax be within the lawful power of the legislature, the exertion of the power may not be restrained because of the results to arise from its exercise."

As to classification and subclassification within the act, it must clearly appear that the judgment of the legislature is erroneous or that the discretion vested in the legislature has been arbitrarily abused. In *Melton* v. *City of Paris,* 333 Ill. 190, this court sustained the validity of a wheel-tax ordinance which separately classified passenger carrying busses, trailers and property hauling vehicles, imposing a specific tax rate for each class. We there said: "Even though the municipality, under authority of the statute, may have had the power to make other classifications and distinctions between vehicles of the same class as to carrying and motive power other than those provided by the

ordinance, yet the failure so to do did not render the ordinance unreasonable or unconstitutional, provided the classification and the rates charged were reasonable, were authorized by the statute and all persons within the class were treated alike. Before a court will override the judgment of a legislative body it must clearly appear that the judgment of such body is erroneous or that the discretion vested in the municipal authorities has been abused. A court will not hold an ordinance void and unreasonable where there is room for a fair difference of opinion upon the question, even though the correctness of the legislative judgment may be doubtful and the court may regard the ordinance as not the best which might be adopted for the purpose. [Citations.] The classification as provided in the ordinance was not unreasonable, it did not violate any constitutional provision, and the decree was not erroneous in so finding."

The evidence clearly discloses that the Motor Vehicle Law and the Motor Fuel Tax Act impose taxes which will produce approximately sixty per cent of the revenues needed by the State for the maintenance, improvement and construction of State highways in the next several years, and under the terms of said acts such revenues must be so used. It also appears that the Motor Vehicle Law imposes a tax on trucks graduated according to weight bracket which, when combined with the motor fuel taxes paid, will approximately equalize the taxes paid per ton-mile of all motor vehicle operators, passenger and truck. The taxes imposed by the amended act have a reasonable basis, are not discriminatory, and do not produce a revenue in excess of fair and reasonable compensation for the privilege of using the State roads. The act is not arbitrary nor discriminatory in violation of the due process clauses of either the Federal or State constitutions.

Plaintiffs also contend that subsection (*l*)(7) of section 9 of the act is invalid as a vague, indefinite and un-

workable classification. Such subsection imposes a specified tax on "two axle vehicles which are designed and used for transporting more than seven passengers entirely within the territorial limits of a single municipality * * * and municipalities contiguous thereto, or a close radius thereof, are equipped with hydraulic shock absorbers and whose rates for transportation are subject to the regulations of the Illinois Commerce Commission." The complaint made is that there is no definition of the word "municipality" or the phrase "or a close radius thereof." The intent of the legislature must be given effect, if possible. In *Peabody* v. *Russel,* 301 Ill. 439, this court said in that respect: "It is a canon of construction well recognized, not only in this court but in courts of other jurisdictions, as it relates to statutes, that the chief purpose is to give effect to the intention of the legislature. In seeking such intention courts are to consider the language used, the object to be attained or the evil to be remedied. This may involve more than the literal meaning of the words. That which is within the intention is within the statute though not within the letter, and though within the letter, it is nevertheless not within the statute if not likewise within the intention."

It is to be noted that this subclassification refers to busses whose rates for transportation are subject to regulation by the Illinois Commerce Commission. The only other statutory provision pertaining to operation of busses within municipalities and subject to Illinois Commerce Commission regulations is found in article VI of the Public Utilities Act relating to local utilities. (Ill. Rev. Stat. 1951, chap. 111⅔, pars. 85-90.) By specific definition in section 10-18 of the Public Utilities Act, its provisions apply only to cities, villages and incorporated towns. It is therefore apparent that the legislature, by the use of the word "municipalities" in the statute in question intended to and did refer only to cities, villages and incorporated towns. The phrase "or a close radius thereof" must be read with

the rest of the section also. It is clear that the class created is limited to busses operating within a single municipality or contiguous municipalities or a close radius thereof and excludes all busses operating between noncontiguous cities or intercity busses. It is apparent that the legislature recognized and established as a separate class those city bus lines which, in order to give adequate local service, operate in suburban areas outside of municipalities but which do not operate as "over the road" busses between cities, using the principal State highways for such purpose. Such difference in bus service is recognized by the Illinois Commerce Commission in classifying local bus service as distinguished from over-the-road bus service. Thus the phrase "or a close radius thereof" expresses a well-recognized, ascertainable, unambiguous concept. Subsection (*l*)(7) of section 9 of the amended act is not vague, indefinite and thereby unconstitutional, nor does it contain an unconstitutional delegation of legislative authority.

Plaintiffs also contend that the act, by failing to define gross weight of maximum load, is unconstitutional because of being vague, indefinite and a delegation of legislative authority. This precise language has been continuously in section 9 of the act without change since its original enactment. The evidence shows that the meaning of this phrase has been well understood and has had a continuity of legislative and administrative interpretation of thirty-two years and that the same has caused no confusion, and no one in the case testified as to the existence of any confusion or misunderstanding in respect thereto. The owner in applying for registration states under oath, in his application, the weight of his vehicle, the maximum load and the sum of the two, being the gross weight. The term maximum load has been consistently interpreted as the maximum load the owner intends to carry during the registration period. The Motor Vehicle Law prohibits the use of the highways by a vehicle the gross weight of which

exceeds that stated in the application blank and the evidence carried on the plates on the vehicle. Such language is clear and definite and does not delegate any legislative authority to the Secretary of State.

Plaintiffs further contend that section 20 of the act, as amended, is invalid as an unconstitutional delegation of legislative authority. It is to be noted that the first paragraph of section 20 was enacted in substantially its present form in 1919. Such first paragraph provides a reciprocity as to nonresidents of Illinois only to the extent that the nonresident State grants like exemptions and privileges to residents of this State. Such section was specifically held constitutional in *Brashear Freight Lines* v. *Hughes,* 26 Fed. Sup. 908. The second paragraph of said section is authority to the Secretary of State to "effectuate the purposes" of the first paragraph by entering into a reciprocal agreement with other States.

In *Interstate Trucking Co.* v. *Dammann,* 208 Wis. 116, 241 N.W. 625, 82 A.L.R. 1080, the Supreme Court of Wisconsin considered identical charges of invalidity against a Wisconsin statute and held the act valid, saying: "The Secretary of State is empowered to enter into such an agreement of reciprocity only when 'like privileges are accorded to vehicles owned by Wisconsin citizens in such other states.' That does not necessarily contemplate a bartering and trading between states by their authorized officers, which ultimately culminates in a contract, the terms and relative advantages of which may vary with the ability or inclinations of the negotiators. On the contrary, the statute may rightly be held to contemplate the ascertainment by the respective responsible officers of the existence and scope of reciprocal legislation, and of the conditions prescribed by the legislature to render the same effective; and that, when the existence of such legislation and the scope thereof have been determined by such officers, then, in furtherance of the legislative authorization, and within

the limitations and standard prescribed thereby, the responsible officer shall conclude an arrangement or agreement which will officially be evidence or certify to conformance to such legislative standard, and the resulting reciprocity for which the legislature provided. Thus construed the authorization to the Secretary of State by the Legislature is well within its powers."

Such statute limits the authority of the Secretary of State to ascertainment of the existence and scope of reciprocal legislation, and whether, in fact, reciprocity can be granted under the provisions of section 20. As said by the United States Supreme Court in *Kane* v. *New Jersey*, 242 U.S. 160: "Such a provision promotes the convenience of owners and prevents the relative hardship of having to pay the full registration fee for a brief use of highways. It has become common in State legislatures and New Jersey has embodied it in her laws since the trial of this case in the lower court."

Our conclusion that the reciprocity provision of the act merely empowers the Secretary of State to ascertain which States grant reciprocity to Illinois residents and to embody his findings in the official form of a "reciprocity agreement" not only disposes of plaintiffs' contention that the act delegates legislative authority but also disposes of plaintiffs' contention that such reciprocity agreements violate that provision of section 10 of article I of the constitution of the United States which provides that "No State shall, without the Consent of the Congress, * * * enter into any Agreement or Compact with another State."

There is, however, another conclusive answer to plaintiffs' contention that such reciprocity agreements would constitute a "compact with another State" in violation of the Federal constitutional provision last above quoted. A consideration of the authorities demonstrates that "agreements," such as those giving effect to reciprocity provisions in automobile licensing cases, are not at all the sort of

"compacts" nullified by the Federal constitution. In *Dixie Wholesale Grocery* v. *Martin,* 278 Ky. 705, it was held that a reciprocal agreement between Ohio and Kentucky for the exchange of data contained in sales tax reports was not a prohibited "compact between States." "There are many matters upon which different States may agree that can in no respect concern the United States." (*Virginia* v. *Tennessee,* 148 U.S. 503.) In the latter case, the court said, at page 519: "Looking at the clause in which the terms 'compact' or 'agreement' appear, it is evident that the prohibition is directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States."

Consideration of these and other pertinent authorities impels the conclusion that the Federal constitutional interdiction of "interstate compacts" was written into the organic law of the land in order to protect a then nascent republic from such *ententes* among powerful States as would aggrandize their political power at the expense or the compromise of national sovereignty. The provision does not inhibit those purely fiscal interstate agreements that facilitate interstate commerce and aid in execution of internal revenue policies. This is particularly true when such agreements conduce to, rather than restrain, commerce among the several States.

Defendants contend that only nonresidents from States that do not have reciprocity can challenge the act on the ground that it discriminates against them and that none of plaintiffs are members of this class. This contention is unsound. Where, as here, the suit is brought by a taxpayer under the statute governing injunctive proceedings to restrain the disbursement of public moneys, (Ill. Rev. Stat. 1951, chap. 102, pars. 11-16,) we have held that the validity of a statute may be challenged by a taxpayer even though he is not, and does not claim to be, subject to the provisions

of the act or to be affected by its provisions except as a taxpayer. *Krebs* v. *Thompson,* 387 Ill. 471.

The plaintiffs' contention that the agricultural exemption contained in section 9 is unconstitutional is not well taken in view of the long line of decisions consistently holding valid, both under State and Federal constitutions, such provisions similar to those under consideration. *Brashear Freight, Inc.* v. *Hughes,* 26 Fed. Sup. 908; *Aero Mayflower Transit Co.* v. *Georgia Public Service Com.* 295 U.S. 285; *Hicklin* v. *Coney,* 290 U.S. 169; *Continental Baking Co.* v. *Woodring,* 286 U.S. 352, 76 L. ed. 1155, 52 S. Ct. 595.

The contention of plaintiffs that section 20 of the act is a violation of the commerce provision of the Federal constitution has been passed upon by numerous decisions of the Supreme Court and is not well taken, and therefore will not be discussed at length. *Storaasli* v. *Minn.* 283 U.S. 57, 75 L. ed. 839, 51 S. Ct. 354; *Hendrick* v. *Maryland,* 235 U.S. 610; *Kane* v. *New Jersey,* 242 U.S. 160; *Hicklin* v. *Coney,* 290 U.S. 169; *Capitol Greyhound Lines* v. *Brice,* 339 U.S. 542; *Aero Mayflower Transit Co.* v. *Georgia Public Service Com.* 295 U.S. 285.

Other questions are raised by plaintiffs and other contentions appear in the briefs of *amici curiae.* A complete answer to most of them can be found in the authorities previously considered and principles of law emphasized in this opinion.

The General Assembly took legislative cognizance, and we take judicial notice, not only of the increase in cost of all types of construction since the early days of the automobile, but, likewise, that modern trucks and busses are much heavier, travel much faster, and are far more numerous than they were in those early days. The heavy cost of maintaining the State's arteries of transit must be borne by someone. The General Assembly could, as it did, place a large share of this burden of expense upon those who

òwn and operate such heavy vehicles as trucks and busses. This it did by a constitutionally permissible exercise of the legislative faculty. It is not for the judiciary to interfere with that exercise when the scheme of classification is not unreasonable and when the contemplated revenues, though great, are not greater than the cost of the highways involved. It cannot be said that a tax on the privilege of using the highways is unreasonably high when that tax does not even equal the total cost of their maintenance.

The Motor Vehicle Law of Illinois, as amended, is constitutional and the decree of the trial court is reversed.

*Decree reversed.*