OPINION OF THE JUSTICES TO THE SENATE.

*Interstate Compact. Constitutional Law,* Interstate compact. *Common-wealth,* Compact with other States. *Contract,* Interstate compact.

Proposed legislation providing that Massachusetts "may enter into a compact with any of the New England States to provide for the control, development and execution of programs of co-operation for the confinement, treatment and rehabilitation of offenders" does not require the consent of Congress in view of the general consent given by Congress in 1934 to compacts between States for coöperation in law enforcement. [774-775]

Discussion by the Justices of the effect of differences in the authorizing legislation of the participating States upon a general interstate compact, contemplating further interstate contracts, for coöperation in the confinement, treatment and rehabilitation of offenders. [776-778]

On July 13, 1962, the Justices submitted the following answers to questions propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit these answers to questions in an order adopted by the Senate on July 6, 1962, and transmitted to us on July 10, 1962. The order recites the pendency before the Senate of a bill entitled, "An Act providing that the Commonwealth of Massachusetts may enter into a compact with any of the New England States to provide for the control, development and execution of programs of co-operation for the confinement, treatment and rehabilitation of offenders," and printed in House No. 14, a copy of which is transmitted with the order.

No extended summary of House No. 14 is necessary as a basis for our answers to the questions stated in the order. The title of the bill describes its general purpose. Section 2 enacts the New England interstate corrections compact "into law" and provides that the compact is "entered into by this state with any other of the hereinafter-mentioned

states legally joining therein in the form substantially as''
set forth in § 2. Then follows the "New England Inter-
state Corrections Compact," art. I of which defines its pur-
pose and policy in part in the following terms, "The party
states, desiring by common action to fully utilize and im-
prove their institutional facilities and provide adequate
programs for the confinement, treatment and rehabilitation
of various types of offenders, declare that it is the policy of
each of the party states to provide such facilities and pro-
grams on a basis of co-operation with one another, thereby
serving the best interests of such offenders and of society
and effecting economies in capital expenditures and opera-
tional costs. The purpose of this compact is to provide for
the mutual development and execution of such programs
of co-operation for the confinement, treatment and rehabil-
itation of offenders with the most economical use of hu-
man and material resources." Article II contains defini-
tions. "State" means one of the six New England states.
" 'Sending state' means a state party to this compact in
which conviction or court commitment was had." The
term "[r]eceiving state" means a party state "to which
an inmate is sent for confinement other than a state in
which conviction or court commitment was had." "In-
mate" means an "offender . . . confined in" an "institu-
tion, *except county houses of correction and jails*" (empha-
sis supplied). " 'Institution' means any . . . correctional
facility . . . in which inmates . . . may lawfully be con-
fined." Article III permits "[e]ach party state . . . [to]
make . . . contracts with any one or more of the party
states for the confinement of inmates on behalf of a send-
ing state in institutions situated within receiving states."
This article prescribes the general character of the con-
tents of such contracts. Article IV provides in consider-
able detail, which need not be stated, for the confinement of
inmates, committed in one party state, in the institutions
of another party state, under arrangements in which the
receiving state shall "act . . . solely as agent for the send-
ing state," and under provisions by which inmates "shall

at all times be subject to the jurisdiction of the sending state," and be assured of due protection of their rights under the law of that state. Article V provides that "[a]ny decision of the sending state in respect of any matter over which it retains jurisdiction pursuant to this compact shall be conclusive upon and not reviewable within the receiving state," subject to an exception which need not be stated. Article V also governs the subject of inmates who may escape. Other articles provide for the acceptance of Federal aid (art. VI); that the compact shall become "effective and binding upon the states so acting when it has been enacted . . . by any *four* [New England] states" (emphasis supplied; see art. VII); for withdrawal of any state upon notice (art. VIII); and for certain other matters (arts. IX and X). By § 3 the commissioner of correction *"subject to the approval of the governor and council"* (emphasis supplied) is directed to carry out the compact.

Examination of the statutes of the other New England states reveals that this compact has already been adopted in each of such states. Conn. Pub. Acts, 1961, No. 326, §§ 1–4. Maine Pub. Laws, 1961, c. 197. N. H. Laws, 1961, c. 101: 1–101: 2. R. I. Pub. Laws, 1960, c. 90, §§ 1–4. Vt. Pub. Acts, 1961, No. 213, §§ 1–4. The compact authorized by each such statute appears substantially like that in each other statute and in House No. 14 prior to the amendments by the Senate discussed in our answer to question 3. There is one minor omission in the New Hampshire statute from art. III (b) of the last sentence, and some trivial variations in form among the statutes exist. Vermont, however, in adopting its statute, included a special provision, see § 3 (a), designed to insure that any inmate committed in Vermont would not be transferred to an institution outside Vermont, except with such inmate's consent, and that each inmate would be subject to the control of the Vermont courts in various respects. This provision is discussed in connection with the answer to the third question.

The questions are these:

"1. Does the interstate compact proposed in said bill require the consent of Congress?

"2.   Has Congress consented, under the provisions of 4 U. S. C. § 111, to said compact?

"3.   If the text of the compact authorized in any state differs materially in substance from the text of the compact authorized in another state, would there be an effective compact in force between such states?''

1.   Article I, § 10, of the Constitution of the United States provides, ''No state shall, without the consent of congress . . . enter into any agreement or compact with another state, or with a foreign power . . . .'' In *Virginia* v. *Tennessee,* 148 U. S. 503, 517–521, at p. 519, it was suggested that the ''prohibition is directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States.''   See *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 725–726; *Louisiana* v. *Texas,* 176 U. S. 1, 16–17; *Stearns* v. *Minnesota,* 179 U. S. 223, 246–248; *United States* v. *Tobin,* 195 F. Supp. 588, 605–606 (D. D. C.).   See also Zimmerman and Wendell, The Law and Use of Interstate Compacts, 21–26; Frankfurter and Landis, The Compact Clause of the Constitution — A Study in Interstate Adjustments, 34 Yale L. J. 685, 694–695, 749–754; Dodd, Interstate Compacts, 70 U. S. L. Rev. 557, 560–562; Hinkle, Interstate Cooperative Institutionalization — A Modern Device for Rehabilitation, 8 Journ. Pub. Law 509, 519; note, 35 Harv. L. Rev. 322, 325.   Cf. Bruce, The Compacts and Agreements of States with One Another and with Foreign Powers, 2 Minn. L. Rev. 500. Although there may be interstate compacts which do not require the consent of Congress, because concerned wholly with local matters and because of the complete absence of any effect upon Federal interests, some later decisions may indicate the propriety of Congressional approval of all interstate compacts.   See *Virginia* v. *West Virginia,* 246 U. S. 565, 601–602; *West Virginia ex rel. Dyer* v. *Sims,* 341 U. S. 22, 27–28.   See also note, 31 Yale L. J. 635, 636–637.   Cf. *Bode* v. *Barrett,* 344 U. S. 583, 586; *Henderson* v. *Delaware River Joint Toll Bridge Commn.* 362 Pa. 475, 484–486, cert. den. 338 U. S. 850.   The matters dealt with

in the proposed compact appear to be solely of local concern and to have no effect upon Federal interests. The compact thus appears to be within the principle suggested in *Virginia* v. *Tennessee,* 148 U. S. 503, 517–521, and requires no Congressional consent, unless the later decisions must be taken as requiring Congressional consent to all compacts. Whether this is so, however, is not now important. As indicated in the discussion below of question 2, we are of opinion that Congress has given advance consent to this compact relating to the prevention and punishment of crime. Consequently, no further Congressional consent is required. In view of our answer to question 2, we answer question 1 in the negative.

2. Congress in 1934 (48 Stat. 909; see 18 U. S. C. [1946] § 420) enacted a general consent to compacts between states for coöperation in law enforcement. This provision now appears in 4 U. S. C. (1958) § 111, amended by Pub. Law (87th Cong.) No. 406, 76 Stat. 9. In respects here pertinent § 111 (a) reads, "The consent of Congress is hereby given to any two or more States to enter into . . . compacts for cooperative effort and mutual assistance in the prevention of crime and in the enforcement of their respective criminal laws and policies, and to establish such agencies, joint or otherwise, as they may deem desirable for making effective such . . . compacts." The House Judiciary Committee report on the 1934 bill (H. Rep. 1137, 73d Cong., 2d Sess.; see Sen. Rep. No. 1007) shows that Congress intended a broad consent to interstate "compacts for cooperative effort and mutual assistance in the prevention and *punishment* of crime" (emphasis supplied) and to the establishment of "whatever joint agencies may seem desirable . . . to make effective such . . . compacts." The specific purpose behind § 111, as it now stands, to give Congressional consent to the very type of compact now under consideration is made plain by the House report (H. Rep. 434, 87th Cong., 1st Sess., May 25, 1961) on Pub. Law No. 406, adding Guam to the list of states and areas which under § 111 (b) might enter into this type of compact. See

U. S. Code, Cong. & Adm. News, 1962, pp. 188, 201–202.
After pointing out that, pursuant to § 111, "there have
been several interstate correction compacts," the report
says, "Among other things, officials of correctional institu-
tions in the United States have long recognized the desir-
ability of providing specialized facilities and programs for
particular categories of inmates held in prisons and correc-
tional institutions. In many States the number of persons
in such special categories usually is so small that separate
facilities and programs prove too costly. It is therefore
considered desirable for the States and Federal possessions
to share facilities and/or facility costs." The report goes
on to show that the purpose of the bill was to permit Guam
to adhere to "the western interstate corrections compact,"
to which Colorado, Idaho, Montana, Nevada, New Mexico,
Oregon, Utah, Washington, and Wyoming were then par-
ties. See, e.g., Colo. Laws, 1959, c. 159; Idaho Code (1961
Supp.) § 20–701; Mont. Rev. Code, 1947 (1961 Supp.)
§ 94–8019. The provisions of this western compact re-
semble closely those of the proposed compact. See House
No. 14. See also Sen. Rep. No. 2737, 84th Cong., 2d Sess.,
U. S. Code, Cong. & Adm. News, 1956, p. 4343. In the light
of this Congressional history, it is clear that Congress has
consented in advance to the proposed compact. See Dodd,
Interstate Compacts, 70 U. S. L. Rev. 557, 561, 564; Hinkle,
Interstate Cooperative Institutionalization — A Modern
Device For Rehabilitation. 8 Journ. Pub. Law 509, 514–
523. See also Fox, Interstate Corrections and Penal Legis-
lation, 42 B. U. L. Rev. 57, 58. Our view is supported by
decisions in other states with reference to somewhat analo-
gous arrangements affecting the prevention and punish-
ment of crime. *Woods* v. *State,* 264 Ala. 315, 319–322
(uniform provisions relating to parolees permitted to live
outside the state in which they have been sentenced); *Gul-
ley* v. *Apple,* 213 Ark. 350, 354 (return of parolees); *In re
Tenner,* 20 Cal. 2d 670, 674–679 (parolee supervision);
*Stone* v. *Robinson,* 219 Miss. 456, 460–464 (same); *Pierce* v.
*Smith,* 31 Wash. 2d 52, 57–58 (same). See also *Bode* v.

*Barrett,* 412 Ill. 204, 232–233; *In re Saperstein,* 30 N. J. Super. 373, 380–381, *S. C.* 15 N. J. 613, cert. den. sub nom. *Saperstein* v. *New York,* 348 U. S. 874.

We answer question 2, "Yes."

3. As a contractual arrangement of a somewhat formal character between states (see *Virginia* v. *West Virginia,* 246 U. S. 565, 592–593; *Dyer* v. *Sims,* 341 U. S. 22, 28–32; see also *Delaware River Joint Toll Bridge Commn.* v. *Colburn,* 310 U. S. 419), a compact should be an ascertainable agreement or arrangement to which the parties have manifested mutual assent. If one party gives assent to one such arrangement and another party gives assent to a substantially different arrangement, there could hardly be such mutual assent as would give rise to a contractual arrangement of the standing and dignity of a compact. See *Simons* v. *American Dry Ginger Ale Co. Inc.* 335 Mass. 521, 523; *Nassif* v. *Boston & Maine R.R.* 340 Mass. 557, 564; Williston, Contracts (3d ed.) §§ 72, 73, 77; Corbin, Contracts, §§ 82, 89, 95.

Although the third question is expressed in somewhat general terms, greater significance is given to it by our examination of the statutes (mentioned above) already enacted by five of the New England states. The differences among the statements of the compact embodied in these five statutes and in the original form of House No. 14 appear to be insubstantial. Particularly is this the case, in view of the circumstance that the principal purpose of the proposed compact (art. III) appears to be to set up the framework for future action so that the compact may be carried out by the negotiation and execution of further interstate contracts covering the matters mentioned in art. III. Cf. G. L. c. 127, § 151A, inserted by St. 1937, c. 307, § 1.

We turn now to the following Senate amendments of House No. 14. (1) The term "inmate" has been redefined to exclude persons confined in "county houses of correction and jails." (2) The provisions of art. III (b) have been struck from the proposed compact. Article III (b) reads as follows: "(b) Subject to legislative approval by the

states concerned and prior to the construction or completion of construction of any institution or addition thereto by a party state, any other party state or states may contract therewith for the enlargement of the planned capacity of the institution or addition thereto, or for the inclusion therein of particular equipment or structures, and for the reservation of a specific per centum of the capacity of the institution to be kept available for use by inmates of the sending state or states so contracting. Any sending state so contracting may, to the extent that monies are legally available therefor, pay to the receiving state, a reasonable sum as consideration for such enlargement of capacity, or provision of equipment or structures, and reservation of capacity. Such payment may be in a lump sum or in installments as provided in the contract.'' (3) Whereas art. VII of the compact as appearing in the original form of House No. 14 provided that the compact would become effective when enacted by any two New England states, the amended form of art. VII requires enactment by four states. (4) Section 3 of the amended form of House No. 14 requires that the commissioner of correction carry out the compact ''subject to the approval of the governor and council.'' Some of these amendments, of course, result in differences from the compact as enacted in other states.

The amendment subjecting action under the compact, by the commissioner of correction, to the approval of the Governor and Council is only a legislative instruction to those officials of this Commonwealth as to the method of their action under the compact. Practice in such matters is likely to vary from state to state. This change will have no effect upon the content of the compact. The amendment making the compact effective as to Massachusetts when approved by four instead of two states, we think, has become immaterial because of the action already taken by five states.

The other Senate amendments, already mentioned, seem designed to limit the area within which Massachusetts may make contracts under art. III of the proposed compact and

the inmates to which such contracts may apply.  In some respects the provision, already mentioned, of Vt. Pub. Acts, 1961, No. 213, § 3 (a), is analogous.  Article III, as has been noted, contemplates additional interstate action by the execution of further interstate contracts.  Each such further contract, in any event, may be limited by each contracting state to such matters as the contracting states, at the time of such contract, agree shall be included therein. In view of this, we do not perceive how the interests of other states will be affected by a present unilateral statement in the compact, as approved by Massachusetts, that from the scope of such further contracts particular subjects will be excluded.  Such unilateral statements will not prevent such further contracts within the scope permitted by art. III as set out in the Massachusetts statute.

The amendments, of course, may have the effect of limiting the usefulness of the compact.  Nothing, however, appears in the Senate order which suggests that these amendments substantially affect the framework set up by the compact for the negotiation of such further contracts as are not excluded by the amendments.

In view of the foregoing discussion, we think that an unqualified answer to question 3 would be misleading.  Accordingly we ask that we be excused from answering this general question with more particularity than the foregoing discussion of it.

RAYMOND S. WILKINS
JOHN V. SPALDING
HAROLD P. WILLIAMS
ARTHUR E. WHITTEMORE
R. AMMI CUTTER
PAUL G. KIRK
JACOB J. SPIEGEL