**Everett CAMERON, Plaintiff,**

v.

**Richard MILLS, et al., Defendants.**

**Civ. No. 86–229–E.**

United States District Court,
S.D. Iowa, C.D.

Sept. 15, 1986.

1120

Steven Wycoff, Jailhouse Lawyer, Fort Madison, Iowa, for plaintiff.

John Parmeter, Asst. Atty. Gen., Des Moines, Iowa, for defendants.

## ORDER

DONALD E. O'BRIEN, Chief Judge.

This matter is before the Court on plaintiff's resisted motion for a preliminary injunction. After hearing the parties' arguments and having carefully considered the briefs filed in this matter, the Court grants plaintiff's motion, based on the strong language contained in the Iowa Interstate Corrections Compact and the agreement between Iowa and Kansas.[1]

---

1. Iowa Code § 247.2 and Exhibit A.

## I. *Facts.*

Plaintiff is presently incarcerated at the Iowa State Penitentiary in Fort Madison. He was originally convicted and sentenced in Kansas, but was transferred to Iowa pursuant to the provisions of the Interstate Corrections Compact, Iowa Code Supp. Chap. 247 (1985) (formerly Chapter 218B), and § 76–3001 *et seq.*, of the Kansas statute. These statutes provide for interstate prisoner transfers in order to "[serve] the best interests of such offenders and of society and effecting economies in capital expenditures and operational costs." Iowa Code § 247.2. Iowa and Kansas entered into a contract to implement these statutes on May 8, 1985.

Plaintiff was involved in a prison uprising at the Iowa State Penitentiary (ISP) in January of 1986. ISP officials found plaintiff guilty of rule violations in disciplinary proceedings conducted pursuant to Iowa Department of Corrections regulations. Plaintiff alleges violation of his Fourteenth Amendment due process rights in the disciplinary proceedings, stating that the Interstate Compact statutes and the contract between Iowa and Kansas mandate that the disciplinary procedures and rules of the sending state (Kansas) should have been followed instead of Iowa rules. Plaintiff has requested this Court to enter a preliminary injunction requiring Iowa officials to afford him a hearing under the Kansas Department of Corrections regulations and to award him damages for unlawful disciplinary sanctions.

## II. *Jurisdiction.*

■ Defendants have raised the threshold question of whether this Court has jurisdiction to enjoin ISP officials. Therefore, the Court must decide this issue before determining the merits of plaintiff's preliminary injunction request.

Defendants contend that this Court lacks subject matter jurisdiction to enjoin state officials on the basis of state law, citing *Pennhurst State School & Hospital v.* *Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In *Pennhurst,* the district court awarded injunctive relief based in part on a state statute which it held provided a right of mental patients to adequate habilitation.[2] The plaintiffs had alleged that conditions at the hospital violated the state act as well as plaintiff's constitutional rights under the Eighth and Fourteenth Amendments. *Id.* at 92–93, 104 S.Ct. at 903–04. The Court of Appeals affirmed on the basis of a federal statute, and the Supreme Court reversed, holding that the federal statute did not create any substantive rights. *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). On remand, the Court of Appeals affirmed its prior judgment, but instead of relying on a federal statute or the Constitution, based its decision solely on a state law which required the state to adopt the least restrictive environment approach for the care of the mentally retarded. *Pennhurst,* 465 U.S. at 95, 104 S.Ct. at 905. The Supreme Court reversed again, holding that the Eleventh Amendment deprives a federal court of jurisdiction to enjoin state officials on the basis of state law. *Id.* at 106, 104 S.Ct. at 911.

In the instant case, defendants argue that plaintiff is requesting this Court to enjoin state officials on the basis of the Iowa and Kansas Interstate Compact statutes. The Court disagrees with defendants' characterization of the relief requested here. Certainly, the Iowa Interstate Compact statute is implicated in plaintiff's request for relief. However, it is not the sole, nor even the main, basis upon which plaintiff bases his request for injunctive relief. Plaintiff's main contention here is that by failing to abide by the Iowa statute, ISP officials have violated his Fourteenth Amendment due process rights. That is quite different from requesting injunctive relief merely because state officials are not following a state court's interpretation of state law, which was what the Court of

---

**2.** Webster's Dictionary (1979) defines habilitate as "to make capable," as opposed to rehabilitate, which is defined as "to restore to a former capacity."

Appeals attempted to do in *Pennhurst. See, Pennhurst,* 673 F.2d at 651.

Nothing in the Supreme Court's *Pennhurst* opinion precludes this Court from requiring state officials to abide by the Constitution. Indeed, Justice Powell specifically noted that the Court of Appeals did not consider the constitutional issues. *Pennhurst,* 465 U.S. at 94, 104 S.Ct. at 904. It is clear that the Eleventh Amendment does not bar a federal court from granting injunctive relief against state officials on the basis of federal claims. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). That case held that a suit challenging the constitutionality of a state official's action is not one against the state and that, therefore, such a suit is not barred by the Eleventh Amendment. *Id.* at 160, 28 S.Ct. at 454. Therefore, the Court concludes that it does not lack subject matter jurisdiction and rejects that portion of defendants' argument.

### III. *Preliminary Injunction.*

Plaintiff has requested that this Court enter an order (1) mandating the application of Kansas regulations to plaintiff's disciplinary hearings at ISP, (2) prohibiting Defendant Harper from rendering final decisions in disciplinary hearings, and (3) removing plaintiff from disciplinary and administrative segregation until such status is issued in accordance with the laws of Kansas.

The Eighth Circuit has enunciated a four-part standard of review in determining whether a preliminary injunction should issue:

> [i]n such, whether a preliminary injunction should issue involves a consideration of (1) the threat of irreparable harm to the plaintiff, (2) the state of balance between this harm and the injury that granting the injunction will inflict on the other parties litigant, (3) the probability that the plaintiff will succeed on the merits, and (4) the public interest.

*Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981). Therefore, the Court will proceed to analyze plaintiff's motion under this standard.

#### A. Irreparable Harm.

■ Plaintiff argues that he may suffer irreparable harm if the injunction is not granted. He states that the Kansas parole board will review his prison disciplinary record and that his ISP disciplinary reports and the three years administrative segregation he received for the January 1986 disturbance will be used against him. It is probable that the ISP reports would be used by Kansas officials in determining whether to reduce plaintiff's sentence. Defendants argue that unlawful or unconstitutional placement in administrative segregation is compensable by monetary damages and that therefore plaintiff's injury is not irreparable. Plaintiff counters, stating that he concedes the validity of defendants' qualified immunity defense, and that even if wrongful placement in administrative segregation is compensable monetarily, he will not be able to obtain such relief because of the qualified immunity defense.

Apart from the above argument, the Court discerns a more important reason why money damages are not available here. In *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Supreme Court held that the Eleventh Amendment bars retroactive monetary relief in suits against state officials. *Id.* at 664–65, 94 S.Ct. at 1356. The Court reasoned that even though the Court of Appeals characterized the award as "equitable restitution", the award would ultimately be payable from the state treasury. *Id.* at 665–66, 94 S.Ct. at 1356–57. Therefore, even were this Court convinced plaintiff merited monetary damages for the time already spent in administrative segregation, it would be powerless to enter such an award due to *Edelman.*[3] Therefore, the

---

**3.** However, this does not prevent an award of injunctive relief regarding the time plaintiff has

*left to serve* in administrative segregation.

Court finds that there is a threat of irreparable harm to the plaintiff.

### B. Injury to Defendants v. Harm to Plaintiff.

Defendants argue that the balance of harm tips in favor of the state officials if the Court grants the injunction. They contend that it would require ISP officials to utilize unfamiliar disciplinary regulations, with the accompanying heightened possibility of errors due to the unfamiliarity. Defendants also point out that as of April 1, 1986, ISP is currently housing 54 inmates from fifteen other states. They argue that an injunction would require them to either hire extra personnel to implement these procedures or create an additional work load for current staff. Defendants also state that forcing them to apply Kansas rules would create confusion and disruption in the disciplinary process at ISP and preclude them from disciplining plaintiff for violations of ISP rules. Finally, defendants claim that any harm to plaintiff is minimal, because Kansas regulations provide for placement in disciplinary segregation for rule violations and in administrative segregation if the inmate's conduct poses a threat to institutional security and order. Defendants conclude that even if Kansas rules apply, plaintiff would likely be placed in administrative segregation anyway, due to his conduct at the disturbance in January 1986.

The Court is unpersuaded by defendants' administrative efficiency and economic arguments, and does not believe they are sufficient to override due process considerations. If the Court issues the injunction, it would merely be requiring ISP officials to follow procedures they were supposed to be following all along. Regarding the argument that even if Kansas rules apply plaintiff could still be placed in administrative segregation, the Court believes that this is based on an erroneous reading of the Kansas prison disciplinary regulations. (Ex. C).

■ Section 44–12–1301 of the Kansas regulations concerns Class I offenses such as rioting and fighting, which was what plaintiff was disciplined for at ISP. Section 44–12–1301(b)(1) states that the penalty for a Class I offense may include "disciplinary segregation, not to exceed 45 days." Section 44–12–1308(a) provides that "the maximum sentence of disciplinary segregation for all violations arising out of one incident shall not exceed 60 days." Section 44–14–301 deals with administrative segregation, which plaintiff contends is akin to Iowa's "close management" status. Section 44–14–301(a) states that "administrative segregation procedures shall be established for the control of inmates for some necessary administrative purpose *other than* punishment." (Emphasis added). Section 44–14–306 provides that "inmates in administrative segregation shall be treated as nearly as possible like any other inmate in the general population of the institution or facility."

■ The above regulations support plaintiff's argument that administrative segregation may not be used as a punishment in Kansas prisons, and yet Iowa officials sentenced him to three years of this status at ISP. Defendants appear to argue that administrative segregation is the same in Iowa as it is in Kansas, and that if plaintiff were in Kansas, he would still be placed in administrative segregation. However, this reasoning ignores indications in the Kansas rules that administrative segregation is not to be used as a punishment, which was exactly what the ISP officials did. Therefore, the Court finds that the potential harm to the plaintiff is greater than the harm the injunction might cause the defendants.

### C. Probability of Success on Merits.

Defendants concede that plaintiff has a liberty interest in not being arbitrarily disciplined and in not being arbitrarily denied reduction of sentence. However, defendants do not agree that plaintiff has a liberty interest in having Kansas rules and procedures applied for disciplinary violations committed at ISP.

Liberty interests protected by the Fourteenth Amendment may arise from two sources—the due process clause itself and the laws of the states. *Meachum v. Fano,* 427 U.S. 215, 223–27, 96 S.Ct. 2532, 2537–39, 49 L.Ed.2d 451 (1976). As for the due process clause itself, Justice Rehnquist has noted:

> [o]ur decisions have consistently refused to recognize more than the most basic liberty interests in prisoners. "Lawful incarceration brings about the necessary withdrawal of limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Thus, there is no "constitutional or inherent right" to parole, *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979), and "the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison," *Wolff v. McDonnell, supra,* 418 U.S., at 557, 94 S.Ct. at 2975, despite the undoubted impact of such credits on the freedom of inmates. Finally, in *Meachum v. Fano, supra,* 427 U.S. at 225, 96 S.Ct. at 2538, the transfer of a prisoner from one institution to another was found unprotected by "the Due Process Clause in and of itself", even though the change of facilities involved a significant modification in conditions of confinement, later characterized by the Court as a "grievous loss." *Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976).

*Hewitt v. Helms,* 459 U.S. 460, 467–68, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983).

However, when the state itself creates a liberty interest, procedures which the state develops to protect that interest are required by the due process clause. For example, in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court found that the state had provided a statutory right to good time which could only be forfeited for serious misconduct. *Id.* at 557, 94 S.Ct. at 2975.

A person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protaction of the individual against arbitrary action of government, *Dent v. West Virginia,* 129 U.S. 114, 123 [9 S.Ct. 231, 233, 32 L.Ed. 623] (1889). Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed.

*Id.* at 558, 94 S.Ct. at 2976.

In determining whether a state has created such a liberty interest, a court must consider whether the state has placed "substantive limitations on official discretion." *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). *See also, Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981) (Brennen, J., concurring) (state statute must provide specific standards which guide the state's decision makers).

The Iowa Interstate Corrections Compact provides in part as follows:

> Inmates confined to an institution pursuant to the terms of this compact shall at all times be subject to the jurisdiction of the sending state....
>
> The fact of confinement in a receiving state shall not deprive any inmate so confined of any legal rights which said inmate would have had if confined in an appropriate institution of the sending state.
>
> Any hearing or hearings to which an inmate confined pursuant to this compact may be entitled by the laws of the sending state may be had before the appropriate authorities of the sending state, or of the receiving state if authorized by the sending state. The receiving state shall provide adequate facilities for such hearings as may be conducted by appropriate officials of a sending state. In the event such hearing or hearings are had before

officials of the receiving state, the governing law shall be that of the sending state and a record of the hearing or hearings as prescribed by the sending state shall be made. Said record together with any recommendations of the hearing officials shall be transmitted forthwith to the official or officials before whom the hearing would have been had if it had taken place in the sending state. In any and all proceedings had pursuant to the provisions of this subdivision, the officials of the receiving state shall act solely as agents of the sending state and no final determination shall be made in any matter except by the appropriate officials of the sending state.

Iowa Code § 247.2.

Similarly, the contract adopted between Iowa and Kansas for the implementation of this statute (Ex. A), provides in part as follows:

(2) *Governing Law*

Except where expressly otherwise provided, the laws and administrative regulations and rules of the sending state shall govern in any matter relating to an inmate confined pursuant to this contract and the Interstate Corrections Compact.

(16) *Discipline*

The receiving state, as agent for the sending state, shall have physical control over and power to exercise disciplinary authority over all inmates from sending states. However, nothing contained herein shall be construed to authorize or permit the imposition of a type of discipline prohibited by the laws of the sending state.

(17) *Laws and Regulations*

Inmates while in the custody of the receiving state shall be subject to all the provisions of law and regulations applicable to persons committed for violations of law of the receiving state not inconsistent with the sentence imposed.

(20) *Hearings*

The receiving state shall provide adequate facilities for any hearing by authorities of the sending state, to which an inmate may be entitled by the laws of the sending state, (i.e. classification, *discipline*, parole, etc.). Upon the request of the sending state, the authorities of the receiving state will be authorized to and will conduct any such hearings, prepare and submit the record of said hearings, together with any recommendations of the hearing officials, to the officer or officers of the sending state before whom the hearing would have been had, if it had taken place in the sending state.

Examination of the Iowa statute and the contract between Iowa and Kansas reveals specific, mandatory language which appears to deny ISP officials any discretion to apply Iowa prison regulations and procedures. The statute specifically states that while incarcerated in the receiving state, the inmate nevertheless remains subject to the sending state's jurisdiction. Also, the statute provides that in any hearings held by receiving state officials, the governing laws and regulations are those of the sending state.

Defendants argue that the words "hearing" and "recommendations" refer to recommendations of actions which affect such things as good time and parole, and do *not* refer to disciplinary hearings. Even if these terms do not actually encompass disciplinary hearings, those hearings *are* the types of actions which affect good time and parole. *See, Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). Even if this were not the case, defendants have pointed to nothing in the statute, legislative history or case law which would lend support to their construction. This Court was able to locate only one reported decision construing this interstate compact statute. *Falkner v. State,* 213 Neb. 474, 330 N.W.2d 141 (1983). That case held that where an Iowa prisoner was incarcerated in Nebraska, he remained subject to Iowa's jurisdiction. *Id.* 330 N.W.2d at 142. However, this case concerned calculation of sentence time, not which state's disciplinary rules apply, and

thus sheds no light on interpretation of the words "hearings" and "recommendations" in the Iowa statute. The contract between Iowa and Kansas, however, *is* illuminating. Section 2 addresses governing law, and specifically provides that the "laws and administrative regulations and rules of the sending state shall govern in any matter relating to an inmate confined pursuant to this contract and the Interstate Corrections Compact." More importantly, Section 20, which concerns "hearings", clearly states that disciplinary hearings are included. Because of the statute's mandatory language, and the specificity with which the receiving state's duties are spelled out in the contract, the Court concludes that Iowa has created a liberty interest in out-of-state prisoners having their "home" state's disciplinary rules and sanctions applied in ISP disciplinary proceedings.

The Court notes that Judge Stuart rejected a similar claim in *Stewart v. McManus,* 647 F.Supp. 1024 (S.D.Iowa 1986). In that case, Judge Stuart found that even though the plaintiff was from Kansas and was incarcerated in Iowa pursuant to the Interstate Corrections Compact, plaintiff was not entitled to application of Kansas disciplinary rules at his ISP disciplinary hearing. Judge Stuart wrote:

Although liberty interests created by state law may be at stake in disciplinary proceedings, the constitution determines what process is due. *Wolf v. McDonnell,* 418 U.S. 539, 557 [94 S.Ct. 2963, 2975, 41 L.Ed.2d 935] (1974). The minimum due process required at a disciplinary proceeding is set out in *Wolf v. McDonnell,* 418 U.S. at 563–72 [94 S.Ct. at 2978–82]. Thus the mere fact that plaintiff has not been afforded the same procedural protections at ISP as he would in a Kansas prison does not constitute a colorable claim under 42 U.S.C. § 1983.

*Stewart v. McManus,* 647 F.Supp. 1024 (S.D.Iowa 1986). This Court has no problem with the statement that the minimum due process required by the Constitution is set out in *Wolff.* However, the Court believes that a state may authorize procedural protections *in excess* of those required by *Wolff,* and that due process mandates that those procedures be adhered to.

There is a separate argument supporting plaintiff's probability of success on the merits. The Compact Clause of the United States Constitution provides in part as follows:

No State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State.

U.S. Const., Art. I, § 10, Cl. 3. Congressional consent transforms such a compact into federal law. *Cuyler v. Adams,* 449 U.S. 433, 438–39, 101 S.Ct. 703, 706–07, 66 L.Ed.2d 641 (1981); *Petty v. Tennessee-Missouri Bridge Comm'n.,* 359 U.S. 275, 278, 79 S.Ct. 785, 788, 3 L.Ed.2d 804 (1959); *West Virginia ex rel. Dyer v. Sims,* 341 U.S. 22, 28, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951); *Delaware River Joint Toll Bridge Comm'n. v. Colburn,* 310 U.S. 419, 427, 60 S.Ct. 1039, 1040, 84 L.Ed. 1287 (1940). However, not all interstate agreements fall within the ambit of the Compact Clause. *U.S. Steel Corp. v. Multistate Tax Comm'n.,* 434 U.S. 452, 469, 98 S.Ct. 799, 811, 54 L.Ed.2d 682 (1978).

Congressional consent is not required for interstate agreements that fall outside the scope of the Compact Clause. Where an agreement is not "directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States," it does not fall within the scope of the Clause and will not be invalidated for lack of congressional consent. But where Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the States' agreement into federal law under the Compact Clause.

*Cuyler,* 449 U.S. at 440, 101 S.Ct. at 707. Thus, the questions are whether (1) con-

gressional consent is required for the Interstate Corrections Compact between Iowa and Kansas, and (2) if no consent is required and the subject matter is appropriate for congressional legislation, does the fact of prior congressional consent automatically transform the Compact into federal law?

As stated in *Cuyler*, 449 U.S. at 440, 101 S.Ct. at 707, congressional consent to interstate compacts is required only where they tend to increase the political power of the states, therefore violating the supremacy of the federal government. This Court can discern no reason why an interstate corrections compact would "tend to increase the political power of the states." The Compact appears to involve only the local interests of the state prison system. *See, Opinion of the Justices*, 344 Mass. 770, 184 N.E.2d 353, 355 (1962) (Interstate Corrections Compact has no effect upon federal interest).

However, the political power test is limited to determining whether compacts *not* consented to by Congress are invalid for lack of that consent. *Washington Metro. Area Transit Auth.*, 706 F.2d 1312, 1317 (4th Cir.1983). In that case, the Fourth Circuit addressed the category of state agreements whose subject matter is appropriate for federal legislation but which did not threaten to increase the state's political power:

> Within this area, apparently, a compact that does not receive congressional consent will not be invalidated for lack of consent, but a compact that is consented to by Congress will thereby become federal law.

*Id.* at 1317, n. 9.

■ Thus, the final stage in this analysis is whether Congress has already consented to the compact between Iowa and Kansas. This Court believes that it has. In 4 U.S.C. § 112(a), Congress provided:

> The consent of Congress is hereby given to any two or more States to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and in the enforcement

of their respective criminal laws and policies, and to establish such agencies, joint or otherwise, as they may deem desirable for making effective such agreements in compacts.

Examination of this statute's legislation history demonstrates that Congress also intended this statute as approval for interstate corrections compacts. The original 1934 bill (H.Rep. 1137, 73d Cong., 2d Sess.) indicates that Congress intended this consent to extend to a broad range of interstate compacts: "For cooperative effort and mutual assistance in the prevention and *punishment* of crime." (Emphasis supplied). Similarly, when Congress amended the statute to include Guam in the list of states and territories covered, Congress specifically noted that

> pursuant [to 4 U.S.C. § 112], there have been several interstate corrections compacts to which various states have adhered. Among other things, officials of correctional institutions in the United States have long recognized the desirability of providing specialized facilities and programs for particular categories of inmates held in prisons and correctional institutions. In many states the number of persons in such special categories usually is so small that separate facilities and programs prove too costly. It is therefore considered desirable for the states and federal possessions to share facilities and/or facility costs.

H.Rep. 434, 87th Cong. 1st Sess., May 25, 1961, P.L. 406, U.S.Code, Cong. & Adm. News, p. 1487. The report also demonstrates that one purpose of the bill was to permit Guam to enter into the "Western Interstate Corrections Compact" then in effect among Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington and Wyoming.

■ Therefore, this Court believes that 4 U.S.C. § 112 applies not only to interstate detainer and extradition acts, *Cuyler v. Adams*, 449 U.S. 433, 442, 101 S.Ct. 703, 708, 66 L.Ed.2d 641 (1981), but to interstate corrections compacts as well. *See also*, Opinion of the Justices, 184 N.E.2d 353,

356 (Mass.1962) (legislative history indicates that 4 U.S.C. § 112 constitutes congressional consent to interstate corrections compact).[4]  Since congressional consent transforms the Iowa and Kansas Interstate Corrections Compact into federal law, and based upon the clear language of the Compact discussed *infra*, plaintiff has stated a claim for relief under 42 U.S.C. § 1983 for the asserted violation by state officials of the terms of the Iowa-Kansas Interstate Corrections Compact.  *Cuyler*, 449 U.S. 433, 450, 101 S.Ct. 703, 712, 66 L.Ed.2d 641 (1981); *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980) (§ 1983 encompasses violations of federal statutory as well as constitutional law.).  Therefore, the Court finds that plaintiff has met the "probability of success on the merits" portion of the *Dataphase* test.

### D. The Public Interest.

■ Defendants argue that the public has a substantial interest in the security of its penal institutions.  They reason that injunctive relief would preclude taking disciplinary actions against plaintiff.  Defendants also contend that injunctive relief would preclude use of the Interstate Corrections Compact in transferring inmates from one state to another.  However, a preliminary injunction will not prevent ISP officials from disciplining plaintiff.  All that need be done is for them to apply Kansas rules and submit a recommendation to the Kansas authorities as to the appropriate disposition.  Additionally, the defendants introduced no evidence supporting

their argument that a preliminary injunction would preclude use of the Interstate Corrections Compact.  The Court realizes that requiring Iowa officials to apply Kansas disciplinary rules will be inconvenient, but as stated before, they agreed to do this in the contract, and inconvenience is not enough to override compact considerations.  The Court believes the public interest would best be served by requiring state officials to abide by the state statutes and their own agreement with Kansas.

### IV.  Relief.

As noted before, plaintiff seeks injunctive relief requiring defendants to (1) apply Kansas regulations to plaintiff's disciplinary hearings at ISP, (2) prohibit Defendant Harper from rendering final decisions in disciplinary hearings, and (3) remove plaintiff from disciplinary and administrative segregation until such status is issued in accordance with the laws of Kansas.  The Court will grant plaintiff's motion for injunctive relief as to all three.  ISP officials are directed to place plaintiff in the ISP status which most closely resembles the status plaintiff would be in were Kansas regulations applied, i.e., close management.[5]  The Court realizes this is a controversial matter, but believes that the Iowa statute and the contract have frozen defendants into this position.  In the event defendants may wish to appeal, the Court will consider staying this part of its order.

The Court also directs ISP officials to apply Kansas disciplinary rules, procedures

---

**4.** The Court is aware of one other case construing an interstate corrections agreement under the Compact Clause.  In *Breest v. Moran*, 571 F.Supp. 343 (D.R.I.1983), the court held that such compacts do not increase the political power of the states so as to fall under the Compact Clause.  *Id.* at 345.  However, the *Breest* opinion does not consider the question of whether prior consent to compacts in areas which may be congressionally regulated automatically transforms the compact into federal law.  Nor did the decision discuss any of the relevant legislative history, which clearly indicates Congress believes interstate corrections compacts were appropriate subjects for congressional legislation.

**5.** While at first glance, this may appear to constitute retroactive relief prohibited by *Edelman v. Jordan*, 415 U.S. 651, 664–65. 94 S.Ct. 1347, 1356–57, 39 L.Ed.2d 662 (1974), the Court believes that the three-year administrative segregation sentence effectively removes this situation from the retroactive relief category.  Plaintiff has not served the full three years, and therefore this Court believes that while plaintiff may not be entitled to monetary damages for the time already spent in administrative segregation, he is entitled to a rehearing to determine whether he may legitimately be forced to serve the remainder of the sentence under Kansas rules and regulations.

and sanctions affording plaintiff a rehearing under the Kansas rules, and in any future disciplinary hearings against plaintiff. Additionally, the Court enjoins ISP officials from implementing any final decision in any future disciplinary proceeding against plaintiff (including the rehearing) unless ISP officials first provide Kansas officials with recommendations and the Kansas officials determine that the proposed sanctions are proper.[6]

IT IS THEREFORE ORDERED that Iowa State Penitentiary officials move plaintiff from administrative segregation status to close management status.

IT IS FURTHER ORDERED that Iowa State Penitentiary officials afford plaintiff a rehearing under the Kansas rules, and in any future disciplinary proceedings against plaintiff.

IT IS FURTHER ORDERED that Iowa State Penitentiary officials are hereby enjoined from implementing any final decision in any future disciplinary proceeding against plaintiff (including the rehearing) unless Iowa State Penitentiary officials first provide Kansas officials with recommendations and the Kansas officials determine that the proposed sanctions are proper.

IT IS FURTHER ORDERED that the Court is persuaded that this ruling is an interlocutory order granting a preliminary injunction under 28 U.S.C. § 1292(a)(1), and therefore this Court does not need to certify this order for an interlocutory appeal under 28 U.S.C. § 1292(b).[7]

IT IS FURTHER ORDERED that this ruling shall not become effective until twelve days after its filing, and that if an interlocutory appeal is sought, a stay of this order shall automatically be effective.

---

6. In granting plaintiff's request, the Court does not condone plaintiff's conduct. If he is found guilty under the Kansas rules for rioting, he will have committed a serious offense, one that greatly endangers the tranquility and security of any prison. Also, this order should not be read to prevent ultimate imposition of any or all sanctions for Class I offenses under Kansas regulation § 44–12–1301, which includes prosecution under state criminal statutes. Also, nothing in this order prohibits use of § 44–13–101(a), which permits an inmate to waive the right to any time limit or process afforded by Kansas rules.

7. The Court notes that a contrary result on the issues discussed in this order has been reached by the Honorable Harold D. Vietor in *Darnell v. Farrier,* —— F.Supp. ——, 86–366–B (S.D.Iowa June 2, 1986), and the Honorable William C. Stuart in *Stewart v. McManus,* —— F.Supp.——, 86–185–A (S.D.Iowa June 13, 1986), and after conferring with these judges, this Court is persuaded that this matter should be resolved by the Circuit Court.